The next case today is Andre W. Wong et al. v. FMR LLC et al. Appeal number 20-1286. Attorney Barron, please introduce yourself onto the record. Good morning again, your honors. May it please the court, my name is Alec Barron, appearing for the plaintiff's appellants this morning. Good morning, Mr. Barron. Please proceed. Thank you, your honor. And before I begin, if the court would allow, I'd like to reserve five minutes of my time for rebuttal. We'll give you four minutes for rebuttal. Sure thing, thank you, your honor. Your honors, this case can only be understood as the latest chapter in a familiar story of retirement service providers employing opaque and deceptive pricing schemes to advantage themselves at the expense of the plans and participants they service. And at the threshold of the case is the question of whether fidelity and the related entities that are defendants in this case are fiduciaries with respect to the conducted issue. And on this question, we submit that the district court made several errors, reversal of any of which would render dismissal of the case improper. In reviewing the motion to dismiss, the district court construed the complaint in the light most favorable to the defendants, indeed crediting Fidelity's accounting of the facts in their suggested inferences, which is a departure from the pleading standard. In addition, the district court construed incomplete contested documents in Fidelity's favor. Yet even if the documents could be properly considered, they reveal the sufficiency of the complaint. In first turning to plaintiff's theories of Fidelity's fiduciary status, and particularly the theory that Fidelity is a fiduciary by virtue of self-determining its compensation, it's uncontroversial that an entity becomes a fiduciary with respect to its compensation if it has discretion or control over the factors that determine the amount of its compensation. We think the Glass Dimensions case puts it well, and it's carried through throughout the case law. Now, the complaint alleges that this is precisely the case when Fidelity, after entering into the contracts with the plans, shakes down mutual funds for additional compensation, which is ultimately paid by the plans. Now, the rule is not concerned with discretion or control over compensation that defendants receive from the mutual funds, but rather, discretion or control over the compensation they receive from the plans. So while Fidelity argues, and the district court reasoned that plaintiffs have not alleged that mutual funds are absolutely required to pay the infrastructure fees at issue here, that's a red herring. When mutual funds pay infrastructure fees pursuant to the allegations of the complaint, Fidelity is clearly a fiduciary with respect to its compensation, which ultimately, again, comes from the plans. How does that get passed on to the plan? I thought these mutual funds, I didn't think they charged different prices to different participants. That's right, Your Honor. One of the ways that the expenses of mutual funds are reflected is in the expense ratio that appears in the prospectus or elsewhere, but there's nothing in the record that suggests that that is where the infrastructure fees at issue here ultimately land. In fact, there are a number of ways that mutual funds can hide fees or fail to disclose fees, such as transaction fees, which come out of the performance of the mutual fund. While Fidelity asserts that mutual funds do reflect the infrastructure fees in their expense ratio, there's actually nothing in the record that suggests that's the case. Aren't they required by federal law to disclose their expense ratios? They are required to disclose their expense ratios, Your Honor, but two responses to that. First, there's no evidence that the expense ratios are ultimately where the infrastructure fees impounded. It may well be the case, based on the record, that the infrastructure fees are included in transaction or other fees that are not disclosed, but rather come out of performance, and the law permits such fees not to be disclosed in that manner. In addition, there's an important distinction to cases like Lime Cooler, where the expense ratio was found to fairly represent the bottom line cost, or at least provide sufficient disclosure  Because revenue sharing is reflected in the difference between share class costs, as alleged in those cases, the difference in the expense ratios of various share classes reflected the revenue sharing payments. So a plan sponsor could discern the amount of revenue sharing associated with different share classes. And here, there's no calculation that can occur such that a plan sponsor is able to discern the amount of infrastructure fees that might be, but aren't certainly based on the record, in expense ratios. We also have an allegation, I would note, that the contracts that Fidelity enters into with mutual funds actually prohibit mutual funds from informing plans of the amount of infrastructure fees that are paid. So that's an additional strong fact, giving rise to the inference that there is insufficient disclosure here. And ultimately... Could you just explain the harm to your clients from what you're describing? Well, the harm is that the plans at issue, and ultimately the participants, are bearing the cost of infrastructure fees that Fidelity's on. How is that happening? I guess, is that only because of the possibility that it's showing up elsewhere than in the expense ratio? Well, one way or another, the plans... Which way?  Well, sure, your honor. Whether or not it's reflected in the expense ratio, it is being paid by plan participants. It's either coming out of the performance of the funds, which affects their returns, and ultimately retirement savings, or it's included in the expense ratio, albeit insufficiently under ERISA's disclosure regime. So one way or another, whether it's in the expense ratio or not, the plans and participants are ultimately bearing the cost of these infrastructure fees, pursuant to the allegations in the complaint. That's what I'm not seeing. I mean, let's take the Picken-Oppenheimer Fund, and they put it in the main menu. Are you saying the Oppenheimer Fund, for the participants who are affiliated with Fidelity, have higher fees that aren't disclosed than if just some other plan who doesn't have infrastructure fees, but participates in the Oppenheimer Fund? Well, we're not necessarily alleging that the fees differ as between somebody whose retirement account is serviced by Fidelity and someone who's not, as it relates to a particular mutual fund. In fact, it may be the case that the cost of that mutual fund, in general, as to people whose accounts are serviced by Fidelity or not, are made more expensive as a result of that mutual fund. As a result of these infrastructure fees. Of course, participants in these plans at issue here are able to allege the breach as it relates to the fees that they're paying. But it's a slightly different issue, I would suppose, as to the fees that non-Fidelity retirees, or I should say, participants whose accounts aren't serviced by Fidelity, might pay. Your premise seems to be that if your plan signs up with Fidelity, then for the ABC Fund, you're gonna pay a bit more than if you got the ABC Fund through some middleman that didn't have infrastructure fees. That seems to be the premise. Well, Your Honor, I think it's slightly different in the sense that what's clear is that a participant is paying more than they would be were Fidelity not charging infrastructure fees. We don't have allegations as between somebody whose account is serviced by Fidelity and somebody whose account isn't. But as a result of these infrastructure fees, the mutual funds are paying to Fidelity. The retirees accounts are suffering. And how is that if they would not get a better deal on that fund through some other? Well, the inquiry, Your Honor, in our view, is that Fidelity's control over its compensation vis-a-vis the plans. So it's about whether the plans would be getting a better deal on the fund, to put it that way, from Fidelity, or from where Fidelity not charging the infrastructure fees. The difference is as between infrastructure fees or no infrastructure fees. Because a mutual fund may well choose to lower its expense ratio, even if it's not, may well choose to lower its expense ratio. It's just not able to do, now that Fidelity is assessing infrastructure fee under the most charitable view of defendants, where they say that the mutual funds are taking it out of their profits, which is contrary to the allegations in the complaint and unlikely based on the inferences arising therefrom. If we, just sticking with this injury theory for a second, if we shift from your compensation argument to your other theory of liability, which I guess the district court portrayed as your third theory of liability, which was that the fiduciary breach, the fiduciary relationship plus the breach inhered in the selection of who's on the main menu. What's the injury there? Well, the injury there is ultimately the same injury. The theory of fiduciary liability is slightly different. Why would that be the case for just changing who's on the main menu? Because your clients, there's no allegation that your clients are all invested in whoever's on the main menu. It's only on the small menu, right? Right, but ultimately what we elect is the person who's on the main menu. So, we don't pledge that funds on the small menu are assessed in infrastructure fees that have increased over time. So, I suppose the question of damage is there. No, no, no, what I'm saying, I thought you had a separate claim apart from whether Fidelity operates as a fiduciary and breached it with respect to selecting who's on the small menu. That Fidelity was also a fiduciary and breached it with respect to who's on the main menu. Is that wrong? Well, your honor, I think in some senses it's a question of the theory of fiduciary status. I think ultimately the conduct would be a breach virtually the same under either theory. Are you making a separate argument that there is fiduciary status and breach just from conduct with respect to the main menu apart from whether it influences the fund that's on the small menu? I think you could independently find a fiduciary status and a breach under that theory. I asked, are you arguing, are you making such a claim? Well, your honor, so the claim I think is singular. It's the theory of fiduciary status that was challenged at the motion. So, at least encompasses that claim. I think that's right, your honor. Okay, what's the injury as to the part of it that I've just described? Because I didn't see any allegation that apart from small menu funds, funds on the small menu, a change on who's on the big menu injures your clients. And what's the theory of injury as to them if they haven't invested in those funds? Well, in one sense, fidelity is control over the big menu. Ultimately, in the aggregate dictates the funds that are in the small menus, but more particularly, we would agree that the injury is particularized in the case of a plan which has a small menu whose funds become more expensive as a result of infrastructure fees, and they don't have the sufficient ability to reject a fund that's been selected in small menu because infrastructure fees have changed year to year. There's nothing in the record that suggests they could terminate their relationship with fidelity. There's nothing in the record that suggests there's not a penalty should they choose to sub out a new fund for a fund that's become more expensive as a result of infrastructure fees. In fact, I think the contract suggests the opposite if they could even be properly considered. And on that last point, what have you alleged apart from the fact that they have the authority to select who's on the main menu with respect to limitations on exit, et cetera? So you're on the main menu, meaning the big menu? The big menu, yeah, the data menu, yeah. You just referenced some things. You said there's nothing in the record to suggest they couldn't penalize you. There's nothing in the record to suggest, but typically you would have the burden. So if their ability to penalize you matters to the fiduciary question, I didn't see an allegation about limitations on exit or anything like that. All I saw, and I guess the district court characterized it as, you just alleged they had the authority and discretion to choose who's on the main menu. So did you allege more than that that bears on these questions of sort of the ability to lock in? We do allege that Fidelity's choices does have the ability to impact the small menu. The issue was crystallized and arose after the contracts were introduced and Fidelity mounted the argument that they cannot in fact affect the small menu in a way that would be consistent with our allegations. The allegations, you're correct, don't reference the contractual authority or the discretion it might extra contractually exercise affecting the small menu. But this issue sort of arose in the context of the materials that Fidelity proffered to the district court on the motion to dismiss. Suppose they were providing the plan with the paper that the plan uses to do its statements for everyone. They're a broker and they obtained the paper from a third party and they paid the third party $10 and the third party gave it back a dollar. And then they made it available to the plan for $11. Is there any ERISA problem there? I think they're very well made, be your honor. Among them that that could be a prohibited transaction based upon status as a fiduciary or party in interest. The ERISA section 406 absolutely prohibits certain of those transactions. It would depend a little bit on the circumstances. Here we're alleging Fidelity can self-determine its compensation based on these arrangements. In my example, how is there any harm to the participants? The plan before it buys the paper knows exactly what it's gonna be paying to the penny for the paper. It could go elsewhere in the marketplace if it thinks the price is high or not. What difference does it make what the cost structure is on the other side of the transaction? Sure, I think this again highlights the inquiry that is Fidelity's ability to increase its compensation vis-a-vis the plan. So as I understand it, I think in this hypothetical the supplier of the paper wouldn't be collecting any compensation directly from the plans and participants. So I think the facts are slightly different in that sense. But here Fidelity is collecting a payment from the mutual funds that has increased twofold and then another fold in three years and contracted with the mutual funds to ensure they wouldn't tell the plan participants. But they're able to pass on those costs through either increased expenses or decreased performance. So I think that nexus may not be satisfied with the provider in your hypothetical. Do you have authority, the district court rejected your compensation argument in part on the ground that the pass-through is not itself compensation since the payment's being made from the mutual fund. Do you have any authority that suggests that's wrong? It's not obvious to me that that is compensation from the plan, although there's a negative effect on the plan. Typical compensation would be there's an agreement to pay you a certain amount. That's not what you're alleging. So where do you get the idea that the pass-through constitutes compensation? I understand that the pass-through point still would be relevant to the third theory of liability. But just on this pass-through point with respect to compensation, do you have any case that suggests that counts as compensation? Well, I think that the revenue sharing cases are somewhat analogous. And those occurred a decade or so ago, largely and the DOL promulgated new disclosure regulations that required revenue sharing payments which operated in a somewhat analogous way needed to be disclosed. I think, you know, the sense that while these payments are coming from a reduction of plan assets back to fidelity. And I think that's enhanced by the fact that mutual funds cannot tell the plans and participants contractually by virtue of its contract with fidelity of the amounts it's paying in infrastructure fees. So I think the facts more than plausibly give rise in our consonant with the improprieties that were dispelled from the revenue sharing environment. Is there any more questions for Mr. Barron? Thank you. Thank you, Your Honor. Thank you, Mr. Barron. You can mute your device at this time. Attorney Garcia, if you could unmute your device and then introduce yourself on the record, please. Morning and may it please the court. I'm Brad Garcia for the fidelity appellees. If I may just begin plaintiff's argument that fidelity is a fiduciary to plans because it receives compensation from third party fund providers as no basis in the statute and contradicts long settled case law. For more than a decade, courts have dismissed materially identical suits including several against fidelity. And the reason for those dismissals applies equally here. Under the statute, plaintiffs must show that fidelity exercises control over the plan or its assets when negotiating these fees. But fidelity's compensation from third parties whether in the form of infrastructure fees, revenue sharing or anything else does not involve plan assets at all, much less control over them. And so it does not give rise to fiduciary status. A contrary conclusion would upend settled expectations and have profound consequences for fidelity and other service providers. If a provider is a fiduciary when negotiating for its compensation, it is impermissible under ERISA's duty of loyalty to seek to earn a profit instead of putting the interests of plans and participants first. And for that reason- Let me ask you this. Suppose fidelity goes to a mutual fund and says, I'm gonna put you in my plan, but here's the deal. You have to pay me 1% of everything you get. You increase your fee 1%, so it'll be net net no loss to you. And you promise not to tell the plans that we're doing this. Does ERISA allow that? So your honor, if I'm understanding that the assumption there is that fidelity can then actually direct plan assets to that mutual fund? No, it does this to all the funds it puts in its main menu. It has a side deal that they'll raise their fee by 1% and kick that 1% back to fidelity and promise not to tell the plan. It is certainly would not give rise to fiduciary status, your honor, because in that situation, what fidelity is doing is controlling its menu of 10,000 mutual funds. And there needs to be a theory of how plans or their assets are actually affected. And that's why my first question to clarify was, would fidelity be able to actually direct plan assets into those funds? If fidelity could direct, just as in the revenue sharing cases, your honor. So fidelity could force a plan's assets into a fund in order to get more revenue sharing. It would be a fiduciary. Well, let's say they take the small menu and they look at the small menu and any one where there isn't this kickback, they contact the revenue of the fund and say, I need you to raise your expense ratio by 1% and kick it back to me. And don't tell that, just say you're doing it. Don't explain why. If the, that would be between the fidelity and the mutual fund. Until there's control over the plan assets or control over the plan itself, there's no fiduciary status. Whether there's some other problem, the test for fiduciary status under the statute, your honor, it's straightforward. It's what does fidelity control plan assets? Isn't that position inconsistent with the Department of Labor's guidance? No, your honor. I think if the references to the guidance about the interrelation of the big menu and the small menu, the Department of Labor's position on that has been consistent since Hacker. I thought the Department of Labor's position was that if you removed a mutual fund from the small menu, potentially even if you removed it from the big menu, without either giving notice or if you did give notice, giving them sufficient time to object, they treated you as a fiduciary. So almost, your honor. So just to clarify, absolutely. If fidelity had control over the small menu, it couldn't remove plan assets, disinvestment. Even in that AILAC guidance, it seems to be the case without even focusing on the small menu particularly. Did I read it? No, your honor, I do. So in that case, it was in that letter, that provider had control over the small menu. But the language, the DOL language doesn't make that distinction between small and big. I have also studied the, I agree that that letter may have some ambiguity in it. The positions that the DOL has taken since then have no ambiguity whatsoever. We cited the brief they submitted in Hacker and it has been consistent since then, your honor. They say- Well just, okay, let's take it in two stages. Let's start with, suppose they can remove somebody from the small menu. And the way they do it is, they just say, you're no longer on our big menu. So you're no longer one of our funds. So therefore you're just, you're gonna be gone from the small menu. Implicitly, we just don't offer that fund anymore. As I read DOL's advice, I thought they were saying, you have to give notice that you're doing that and an opportunity to object that gives them a reasonable time for the plan to keep the fund in the small menu. Yes, your honor. If you can remove a fund and affect plan assets, remove it from a small menu fund, that is correct. And our point in this case, your honor, is fidelity cannot do that. What fidelity cannot do, that contracts are unambiguous in the complaint, I don't think actually has a contrary allegation. Fidelity cannot reach into the fund and disinvest a fund. And I do, I wanna address this. I think, you know, plaintiffs want an inference that because fidelity controls the big menu, it necessarily controls the small menu. And I just wanna, you know, several points on that, but I'll start with just an analogy. If I'm a catering company and I offer a big menu of meals and someone orders a particular dish for their wedding, I can remove that menu, that meal, from my big menu going forward for others, but still deliver it to that person so that I don't breach my contract. And that's exactly what happens here. And it just goes, this goes to the fact that control over a big menu and a small menu are categorically different. When we get that fact, that sounds like an important fact. I guess I hear you saying that if fund A is on the big menu and the plan selects that for their menu, the small menu, then even if fund A is knocked off the main menu, it still continues on in the small menu? Yes, of course. That would just mean that fidelity would continue record keeping for that particular fund, but it wouldn't offer it to future. Where do we get that? Where do we get that fact? Is that in the complaint? So the complaint alleges only that fidelity controls funds network. So that's paragraph 69. And what I would say is completely absent from the complaint and is unambiguously refuted by the contracts is that fidelity can ever do anything to affect a small menu fund. So starting with the contract, I mean, sorry, the complaint, this distinction between the big menu and the small menu is the conceded dividing line in all of these cases. So plaintiffs knew this would be the issue in paragraph 69 says fidelity controls the funds network. And I also want to be clear about the distinction between these two types of authority. The big menu, small menu can make it sound like they're closely related, but small menu control is the ability to control particular plans and where their assets can go. You can disinvest from one fund and put them in another. If you can do that as a provider, you are not a directed trustee. You have stepped into a whole different category of fiduciary control. And the basic point about this I would like to make your honors is that this same contract language we're referring to has been applied in Hecker, Renfro, Fleming and Columbia Air to dismiss cases materially identical to this precisely because that language shows fidelity does not control the small menu. So for plaintiffs to come to court and now argue in their appellate brief that fidelity actually does, it changed its standard form contracts. Despite winning all those dismissals, it changed its standard form contracts to take on fiduciary control over small menu lineups. That would be a dramatic change. And you would expect plaintiffs to plead it in their complaint and to have a basis for it. And I just wanna address what I think is a striking admission in light of that precedent and that context your honor in their reply brief. They say they did not review the contracts. And what that means is that they refer to their experience. Their experience would include Hecker, Renfro, Fleming, Columbia Air, all holding that fidelity does not have this crucial authority. They also don't have any circumstantial evidence. They could have amended their complaint to allege any instance, your honors, in which fidelity has been removed an option. So let me just ask you a point about that. You know, the DOL letter that I'm talking about that seems to have the broader language. You, right, we're talking about the same. Yes, I still am questioning the premise. That letter says changes that affect existing plan investments. No, so there's that, there's the one, it's ALAC or ALIC. Yes, the Betina letter and then there's a Frost letter, which are generally. Right, but not the Frost letter, the Reeves letter. The Reeves letter seems to have broader language, which doesn't seem to talk about an existing plan. Right? I do think that was still addressing a small menu. It may have been, but the language seems broader. But just so I can understand the logic behind this small plan, big plan distinction that I realize a lot of the courts say. You say the key thing is whether you're directing plan assets, right? Whether you're affecting existing plan investments, I think is more important. Four minutes remaining, four minutes. And the idea is that in the case of pulling something from the small menu, that's affecting existing plan assets simply because they pulled it as part of their general rejiggering of the funds they offer. I think it's a little bit more than that. The assumption is always, because those assets have to go somewhere. So if you have the ability to remove that provider always also has the ability to move them somewhere else. So if you can take them from one fund and move them to another, and if there was an allegation you were doing that. Not that you're moving them to another. So just simply say, we're not offering that fund. You're gonna have to put it somewhere else. You can put it wherever you want, but you gotta put it somewhere else. We don't offer that fund anymore for you to put your assets in. Is that itself, as I read the DOL advice, they say the mere act of saying, you can't put it in this anymore. Not you must therefore put it somewhere else. That will tell you where to put it and give you the limits of where to put it. But just you can't put it in that fund anymore. If you don't have the option as the plan of rejecting the withdrawal, that itself is a fiduciary status act. So I think two points, your honor. The preliminary one is, I don't think that's their argument in this case. They've always tied it, substitute and so forth. Second, I certainly understand the distinction and I would still suggest that the power just to remove, especially when it's part of maintaining and curating a 10,000 fund option platform. But I don't think that we need, certainly not hinging my position on that because my position is that these contracts. No, I get it. I just want to understand what. But you agree DOL seems to be of the view that the mere act of removal, if the plan doesn't have ability to reject that removal, is itself enough to make you a fiduciary? I think that is one reading of the letters that you're referencing, your honor. Okay, and if that reading were right, do you and say, I was persuaded by that. Is there a way to distinguish that conclusion from the conclusion that removing it from the big menu is also a fiduciary act? And what would be that distinction if all that was being done was the removal of the fund from the offerings by the service provider? Because when the fund is just removed from the big menu, if a plan is not invested in that fund, that change doesn't affect the plan at all. It might, as the Seventh Circuit said in Hecker and Limeculer, limit their choices in the future. They can choose 9,999 instead of 10,000, but it is not, that is influence. Remember the test under this court's decision in Cottrell under the statute is control, not influence. So if Fidelity is taking off one, 10, 100 funds that a plan is not invested in, there's no control over the plan. That is why, and that's the fundamental distinction between big menu and small menu. The plan is simply not effective. It's not affecting existing plan investments. And I think that would line up with all of the cases that we're relying on, Hecker, Fleming, Limeculer, and even Santomeno. So this is the, I do wanna return to the point about the contracts though, Your Honor. All of these cases have held that Fidelity cannot do what Your Honor is positing. And the plaintiffs in their reply brief have essentially said they have no basis for their allegation that Fidelity has dramatically changed its relationship with plans and taken on this authority. There's simply no basis for it. And the district court properly dismissed that. And where in the contract specifically do you point to that makes clear that Fidelity by removing a fund from the main menu doesn't remove it from whatever small menus that theretofore was on? So what the contracts make clear, Your Honor, is that Fidelity cannot take any action that would cause a fund to be removed from the small menu. And so that's section five of the service agreement. It's article 8.01 of the basic plan document. And I would say it's article 20.04 of the plan document, which says Fidelity is a directed trustee. A directed trustee inherently has no authority with respect to the investment of plan assets. It just, it does not cross that line. But just to be more specific to direct answer to that question, section five of the service agreement says Fidelity shall have no responsibility for the selection of permissible investments, no discretion with respect to the investment of plan assets, but shall act solely as a directed trustee. And then the plan fiduciary affirms that it will make all decisions concerning the plan's permissible investments by exercising independent judgment. Well, that doesn't quite say that it can't, that it has to continue making available everything that's on a small menu. It says that it cannot remove it from the small menu. Where does it say that? What's the language that says that? If Fidelity could veto a plan's choice of a permissible investment. That's not what we're talking about. No, no, no. Day one, it's on the main menu. Small menu gets constructed and they pick fund A. A year later, Fidelity decides to take fund A off its main menu. What happens to the small menu when Fidelity removes fund A from the main menu? Does it continue on? And I think you've told us it does. And so the question was what specific language says that fund A would continue on in the small menu, notwithstanding its removal from the main menu? Your Honor, I think it's all the language that I'm referring to because that would be a decision concerning a permissible investment. And in practice, Your Honor, what it means to remove a fund from the big menu from Funds Network is that Fidelity is no longer going to record keep for that fund going forward. It can continue delivering record keeping services for that fund, just as in the catering example, you can deliver to the one customer, even though you're not gonna offer it in the future. And so I just wanna be clear, this is the contracts say Fidelity can't take any action that affects a permissible investment. And so this is sort of common sense that these two things, the ability to remove a fund from the small menu and move plan assets is not inextricably intertwined with control over a big menu. Again, that's what all of these cases have said, that it is crucial whether Fidelity can affect the small menu. And Fidelity is careful not to cross that line. Maybe you're just gonna say the key word here is existing assets, but just to use the word permissible investment, suppose the plan says, I noticed last year you had this fund on your main menu, your big menu, that looked great. And I'd like to now add it to my small menu. Can Fidelity say, no, it's not on our big menu anymore. You can't invest in that. Yes, Your Honor, if that fund had been removed before the plan selected it from Funds Network, then it is undisputed that the fund needs to be on Funds Network initially. And our position is that once it's selected in a small menu, Fidelity cannot remove it. And I just wanna be clear that to the extent the court thinks there's any ambiguity, I do not think these are ambiguous at all. But Fidelity for more than a decade has made the same representation I'm making to you today, that in HECR, Renfro, Fleming, Columbia Air, that Fidelity cannot take any action to remove a fund from a small menu. So if Fidelity was in a dispute with T-Mobile and Fidelity said, I wanna, we wanna take this fund off our Funds Network. And that means it's gotta come out of your small menu. Fidelity would be laughed out of court, Your Honor. There's no provision in the contract that suggests that they have that authority. Section five prohibits it. And Fidelity has been making this representation consistently. I also wanna point out, Your Honor, we raised this issue in our motion to dismiss. There are 14 plaintiffs in 11 different plans. If they had any indication that Fidelity had ever reached into a small menu and removed a fund, they would have said so. But they don't have that. It does not happen. This entire theory that Fidelity has the authority to, or ever has, removed a fund from a planned small menu is based on speculation. And it's contrary to our case law and Fidelity's representation. I just have one last question. Some of these cases seem to talk about having to give notice in a reasonable time period to the plan. Is that with respect to removal from the small menu? Yes, Your Honor. So if the provider- Just one thing that I'm just, just so I get it. Because what you were saying is it seemed just, the idea that you can take something off a small menu at all is just, you'd be laughed out of court. Yet when I look at these cases and these materials, they seem to contemplate that it's simply standard practice that sometimes you can remove it from the small menu. And that what matters is how much notice you give and how much time you give to the plan to object to that. So is it actually standard that sometimes we would assume the service provider can pull it off the small menu? Or is it standard that that's verboten? It's ridiculous. There's no reason to even think about timing and notice. Thank you, Your Honor. This is a very helpful question because in fact, there are two standard ways to do it. My point is that fidelity would be laughed out of court. The second way to do it, absolutely, is to allow the provider, when it changes its big menu, to change the small menu as well. And in that situation, to avoid fiduciary status. That, again, it's affecting an existing plan investment. So they've got to give notice and an opportunity to reject it. And just to go back to the basic test here, Your Honor, I think the Tenth Circuit puts it well in TEATS. A provider is a fiduciary if it can force a decision on a plan without, that takes effect before the plan can reject it. So in our situation, fidelity just gets off at stage one. It cannot take an action that affects the plan. In the other cases, they can take an action that affects the plan. And so it's important that the plan has a real opportunity with notice, without a massive termination fee, to reject that. And the model of that is Santa Mena. And just to go back, I think this helps the contract point as well, Your Honor. If you look at the briefing in the Third Circuit Santa Mena decision, there is a specific provision that says the provider can remove funds from the small menu as part of curating its big menu. And in that situation, it will provide advance notice. There's no analogous provision here because fidelity simply doesn't have that authority. And to just return to my initial point, this is something with massive consequences that providers know about. This is not something that goes unsaid in a contract or left open to question. This is about where participants in a plan can invest their funds. It's addressed clearly. And in this contract, it is addressed by saying fidelity has no authority with respect to permissible investments. That's been applied in the prior cases. Thank you, Mr. Garcia. Thank you. Thank you, Mr. Garcia. You can mute your device at this time. Attorney Barron, you have four minutes of rebuttal. Please reintroduce yourself to the record. Thank you. Good morning again. This is Alec Barron for plaintiff's appellants. Yes, Mr. Barron, you should assume we let Mr. Garcia run over a fair amount. You should assume I'm not gonna hold you tightly to the four minutes here. You'll have at least three minutes or so extra. Okay. Thank you very much, Your Honor. I just wanna begin by picking up on this discussion of what happens if a plan wants to retain a fund in its small menu that fidelity has decided to remove from the big menu. And note that what Mr. Garcia is suggesting, what fidelity has suggested, is not found in the record. And I think it's important to note that the cases that they cite to were virtually all decided either at the summary judgment phase or after significant discovery had been undertaken. And I think it's important to note that we allege fiduciary status under both prongs of the functional fiduciary definition, one which is the exercise of discretion authority, but one, the second which, is just the maintenance of that authority. And while Mr. Garcia argues that we haven't alleged specifically with respect to the plans at issue, that there have been instances where plans have been eliminated from the small menu, we submit that the contracts allow that. And the district court's consideration of the contracts tracked with the defendant's suggested inferences that arise from them. But we point out other sections in the briefs of the contracts, which we submit cast doubt on fidelity's ability to unilaterally change an investment option in a plan, whether it could charge a termination penalty, or whether it could assess fees if a plan elected to swap out a mutual fund that suddenly became more expensive as a result of an infrastructure fee. I think another important point about some of fidelity's authorities is the timing of the conducted issue. Here, the complaint alleges that fidelity acted after entering into the contracts with the plans to increase its compensation from the plans, while the vast majority of their authorities concerned conduct that occurred either prior to or incidental to the negotiation of the contracts at issue. But again, here we allege that after entering into the contracts, fidelity has sought to impose the infrastructure fees. So I think that's an important distinction between these cases and those, particularly as it relates to the contracts. Much of the case is about application of the contracts, which there is no ability to test before the district court. And in fact, it was fidelity's position, both before and after the motion to dismiss was briefed, that there should be no discovery related to the case. So there was no ability. Mr. Barron, what do you say, as I understand one of the things we're hearing, it's that fidelity is consistently taking the position that it doesn't have any control over the small menu. If it ever did exercise that control, given what it's been saying in litigation and given what we heard today, the plans would have a lay down hand against it. And the plans and the beneficiaries would know if they'd ever done this, because it'd be obvious that a fund was disappearing. They said, given all that background, the absence of a allegation in the complaint that they've ever done this is telling. Well, we do allege that they maintain that authority. And that's kind of the critical distinction, as I said a moment ago, between two prongs of the functional fiduciary test. What do you mean maintain if through a large number of contracts and literally thousands of millions of transactions, they've never done it? It seems odd to say they're maintaining something that is never done. Particularly when they disavow it in court. Well, the record doesn't speak to instances in which they did it. And as they note, the plaintiffs in this case represent a little over 10 plans in their different contracts, or they've each entered into contracts with fidelity. So while the record doesn't speak to what's happening out in the marketplace, and those assertions are as they may be, the portions of the contract that we point to are slightly different than what is addressed in previous cases. And again, in the reply briefing, we note instances where the contracts are ambiguous about fidelity's authority. And that is essentially the bargaining chip that they can go to the mutual funds with to coerce these infrastructure. Does this just go to the injury point though? In other words, they have to remove it from the, on this theory, if what we're fighting about is whether or not they removed it from the small menu, put aside the compensation theory. But if what we're going to is whether they removed it from the small menu or not, whether they have the authority to do that. Certainly until they do that, there's no injury, is there? Well, in fact, we would submit there is, Your Honor. When they keep a fund in, which has become more costly, either by virtue of its expenses or decreased performance, when they keep it in a plan, by power of their coercion and ability to restrict exit, when they keep it in, the plan encounters and incurs the consequences of the infrastructure fee. The plan could eliminate Fund X from the small menu if it wanted to. Well, we suggest that the contract doesn't make that a certainty. I'd point to- You're saying the threat that they could do that is why everybody in there is still in there because they're all willing to pay the fee. Right, right. I mean, certainly if they assess- I got it. If they assess- Here's what's a little odd. We have a contract. You're saying there's an ambiguity and we should draw an inference that Fidelity has a certain power vis-a-vis the plans. Fidelity says it doesn't have that power. Who's going to claim that it does? Certainly the plans are happy with the position that Fidelity is saying how it interprets the contract. They're not going to come in and say, oh, we can't remove stuff. Well, again, I think much of this rests in the way that the contracts are applied, which we suggest creates the necessary discretion and control. And as I said- But I guess in theory, if the theory is that this latent control explains why everybody's paying these infrastructure fees that are in their big menu, whatever they say now, if you could show in discovery, that it was understood between the mutual funds that were paying the infrastructure fees and Fidelity that that control existed, that would be helpful to you. And it wouldn't matter if they now, we say this is what it means because so long as it was understood they had that power, then they were fiduciary and they were exercising their fiduciary power in a wrong way to milk these fees, right? Oh, absolutely, your honor. And if you look at Petit's case, which Mr. Garcia cited, there was permissive language like is found in this contract. And it was only at summary judgment after full discovery that they could determine that the main language was never acted upon. That's been seven minutes, judge. So are there any other questions for Mr. Barron? Just one last question. The way I read the district court, it says that it describes your allegations as simply saying they had discretion over who would be in the big menu. Just that it had the selection power. And that was all that was really alleged in the complaint. And if, could you identify something, where does the complaint say something more than that? We alleged in a few different instances, as many as five instances in the complaint that they're exercising control that would translate to control over the small menu. By the power to remove something from the small menu? Yes, Your Honor. Mr. Garcia cited paragraph 69, but we would suggest that paragraph 71, 81 and 100 also deal with this without the parlance of the big menu. There, those paragraphs are suggesting that their authority does reach down into the small menu and can at a minimum. Thank you very much, Mr. Barron. Thank you, Your Honor. That concludes argument in this case. Attorney Barron and Attorney Garcia, you should disconnect from the hearing at this time.